■ In the Matter of the Arbitration between INSTITUTE OF INTERNATIONAL EDUCATION, Respondent, and PERMANENT MISSION OF SPAIN TO THE UNITED NATIONS, Appellant.—Order and judgment (one paper) of the Supreme Court, New York County (Irving Kirschenbaum, J.), entered April 4, 1985, granting the application by petitioner to vacate an arbitration award dated May 2, 1984 and ordering a rehearing before a panel of arbitrators to be designated de novo, is unanimously reversed, on the law, the application by petitioner denied, the petition dismissed and the arbitrators' award reinstated, with costs and disbursements payable by petitioner.

Petitioner Institute of International Education (Institute) owns an office building located at 809 United Nations Plaza. Pursuant to a lease, respondent The Permanent Mission of Spain to the United Nations (Mission) occupies the sixth floor of the premises. Clause 35 (a) of the lease provides, in pertinent part, that the tenant has the option of renewing the lease "at the then fair market value of space similarly situated and serving a similar purpose at the time of renewal".

The Mission exercised its option to renew the lease for a five-year term commencing October 1, 1982; however the amount of rent due was disputed. Having agreed to arbitrate the issue, the Institute sent a proposed arbitration agreement to the Mission, which the latter revised and returned to the landlord.

This proposed agreement, as revised, submitted the following question to the arbitrators: "What was the fair market value of space similarly situated and serving a similar purpose to the space occupied by the Permanent Mission of Space to the United Nations as at October 1, 1982?"

In the agreement, Frederick E. Marx, a real estate appraiser, was named as the Institute's party arbitrator and Seth Miller, a real estate broker, was named as the Mission's party arbitrator. These two men were empowered to select a third impartial arbitrator.

There was a further provision that the arbitrators "shall take the oath prescribed by § 7506 of the Civil Practice Law and Rules and shall fix a schedule for the commencement and completion of hearings". Five days before the first meeting of the panel, the party arbitrators were to exchange and submit to the third arbitrator "written reports setting forth their conclusions of value and describing the comparable rentals and all other information which they relied upon in reaching their conclusions."

By letter dated February 3, 1984, the Institute "[suggested] that before we try to rewrite and execute the arbitration agreement we have Messrs. Marx and Miller see if they can agree on the selection of a third member of the panel". The Mission apparently agreed and on February 22, Marx and Miller agreed that Henry Hart Rice, chairman of James Felt & Co., would be the third arbitrator.

The arbitrators met for the first and only time on May 2, 1984. Counsel for both parties were absent; no testimony was taken. The following documents were submitted for Rice's examination: Marx' appraisal, a memorandum prepared by Miller and counsel for the Mission, and a reply memorandum prepared by the Institute's attorney.

Marx recommended a base rental of $35.72 per square foot for 1982-1983, increasing to $59.53 per square foot for 1986-1987. The Institute's appraiser had urged, "The fair market value of the 6th floor space is arrived at by applying the same rent to it, as applies to space similarly situated and serving a similar purpose for other tenants in the building." The rents for missions located on the second, sixth and seventh floors were listed and are identical to the amounts recommended in the appraisal.

However, Miller argued that rent should not be determined by the rents paid by the three other tenants but rather "with reference to the actual space market, i.e., overall condition and specific availabilities, in the relevant United Nations area at the time". The tenant stated that missions are located throughout the United Nations area, which includes 42nd-50th Streets and First-Lexington Avenues. The Mission noted that since mid-1982, commercial rental rates had decreased.

On May 2, Rice issued a decision setting the " 'fair market value' as of October 1982 for premises proximate to the United Nations and leased to a foreign mission as $31 per square foot plus $3 for tenant electric. * * * [T]he escalation base for real estate taxes should be the New York City fiscal

year beginning July 1, 1982 and for operating expenses the 12-month period ending December 31, 1982." The Mission's arbitrator concurred in the impartial arbitrator's decision as to fair market value.

The Institute commenced the instant proceeding to vacate the arbitration award, asserting that the arbitration procedure violated the terms of the proposed arbitration agreement and the CPLR in that: (1) the arbitrators did not take an oath pursuant to CPLR 7506; (2) no hearing was held; and (3) the parties and their counsel did not participate in the proceedings.

Petitioner also maintained that "[v]acatur is required because the award is in direct derogation of the express language of the lease and effects a material modification of the lease". It argued that Rice ignored the threshold issue of construing the lease phrase "similarly situated and serving a similar purpose" in favor of "redefining the scope of his own power" and also allegedly changed the lease terms regarding payment of escalation rent based upon real estate tax and operating expense increases.

Special Term found that the requirements of an oath and formal hearing were not waived by petitioner and were not complied with. In addition, Special Term found that the arbitrators went beyond the questions raised in the submission to them and therefore exceeded their authority.

The proposed arbitration agreement, albeit unsigned, is sufficient to establish the parties' intent to arbitrate the rent dispute *(Crawford v Merrill Lynch, Pierce, Fenner & Smith,* 35 NY2d 291, 299-300).

The failure of an arbitrator to take an oath may, under some circumstances, warrant vacatur of the award *(Day v Hammond,* 57 NY 479; *Matter of Frajer [Chernofsky],* 278 App Div 798; CPLR 7506 [a]). The CPLR also provides hearing and notice specifications to ensure that due process considerations are respected (CPLR 7506 [b]). Both requirements, however, can be waived by written consent or by proceeding with the arbitration without objection (CPLR 7506 [f]).

The arbitrators' meeting without an oath taking was, at most, a technical irregularity not warranting judicial intervention. "When the arbitrators reach a just result, the courts should not intervene merely because of a possible technical violation [citations omitted]." *(Matter of Kingsley v Redevco Corp.,* 97 AD2d 364, *affd* 61 NY2d 714; *Matter of Raisler Corp. [New York City Hous. Auth.],* 32 NY2d 274.)

Moreover, under the plain language of CPLR 7506 (f) and 7511 (b) (1) (iv), the continued participation of the Institute's arbitrator in the meeting in question, without taking an oath or asking that one be taken, constituted a waiver.

Petitioner herein invoked the "requirement" of an oath to seek vacatur of the award, after the fact and after the arbitrators had rendered their award. This was not timely under the facts herein (see, 8 Weinstein-Korn-Miller, NY Civ Prac ¶ 7506.03 [effect of failure to take oath]).

There is no evidence in the record before Special Term to support petitioner's claim that its attorney did not have notice of the May 2nd meeting. On the contrary, petitioner's reply brief, signed by counsel and submitted at that meeting, bears the date April 27, 1984. In addition, counsel for petitioner asserted in an affidavit that he was prepared to attend the May 2nd meeting provided his adversary was present. Neither attorney elected to appear. It is clear that petitioner not only had the opportunity, but, in fact, presented everything it deemed significant, including its arbitrator's "Appraisal" and its counsel's reply memorandum. Its own arbitrator participated actively. There was neither objection nor request for adjournment at the hearing itself.

Finally, Special Term erred in finding that the arbitrators' determination of escalation bases "exceeded their authority".

The question submitted to arbitration was: "What was the fair market value [in terms of rent per square foot per year] of space similarly situated and serving a similar purpose to the space occupied by the Permanent Mission of Spain to the United Nations as at October 1, 1982?" The arbitrators' answer was:

"[T]he 'fair market value' as of October, 1982 for premises proximate to the United Nations and leased to a foreign mission is $31 per square foot plus $3 for tenant electric.

"It is, therefore, my finding that the rent for the premises comprising 6,750 square feet should be computed at the rate of $34 per square foot including electric throughout the term of the renewal lease, that the escalation base for real estate taxes should be the New York City fiscal year beginning July 1, 1982 and for operating expenses the 12-month period ending December 31, 1982."

The arbitrators, experienced real estate professionals, had been asked for a direct and practical answer to the valuation question submitted. Obviously, in computing a new base rent, the arbitrators incorporated factors such as real estate taxes

and other operating cost increases which had accrued since the prior base rent was fixed. They followed the sensible and standard real estate practice of arriving at a *current* base rent, based on *current* cost and market conditions, subject to escalation from *current* tax and operating cost bases. Neither before, during nor after the arbitration did the landlord's partisan arbitrator take exception to following that practice or request that prior bases be used instead.

Indeed, petitioner's own initial submission to the arbitrators dealt not only with base rental, but also with real estate taxes and operating cost increases. In fact, petitioner itself asked for a base year ending September 30, 1982: "In addition to the base rental and its proportionate share of real estate taxes, the tenant should pay its proportionate share of operating cost increases above the 12 month period ending September 30th 1982, similarly calculated as the New York City real estate tax share."

In view of this express submission, Special Term's holding that "[t]he arbitrators *[sic]* determination of how these rent escalations were to be computed was outside the scope of the dispute under arbitration * * * [and] exceeded their authority" was plainly erroneous.

The arbitration herein proceeded not from a broad arbitration clause, which would generally require specific enumeration in the arbitration clause itself of the subjects intended to be put beyond the arbitrators' reach *(Matter of Silverman [Benmor Coats]*, 61 NY2d 299, 308), but from a narrow submission. As noted, however, the issue submitted dealt with the "fair market value" of the subject space and, as such, the determination as to how the rent escalations were to be computed was clearly within the scope of the arbitration agreement and, therefore, within the province of the arbitrators *(Matter of County of Rockland [Primiano Constr. Co.]*, 51 NY2d 1, 7).

It is a legal axiom that the determination by an arbitrator should not be lightly set aside, and this concept is especially appropriate in the situation before the court. The arbitrators were obligated to determine what constituted "fair market value", and they did so in an expeditious way. Concur—Sandler, J. P., Asch, Kassal and Ellerin, JJ.